LAW OFFICE OF JAMES CHUNG
James Chung
43-22 216th Street
Bayside, NY 11361
Telephone: (718) 461-8808
Facsimile: (929) 381-1019
*jchung_77@msn.com*

SHEEHAN & ASSOCIATES, P.C.
Spencer Sheehan
60 Cutter Mill Road, Suite 409
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Eastern District of New York

| | |
|---|---|
| KBH SPORTS CLUB LLC and DAVID CHUNG, individually and on behalf of all others similarly situated,<br><br>                     Plaintiffs,<br><br>    - against -<br><br>AMERICAN ZURICH INSURANCE CO.,<br><br>                     Defendant. | 1:21-cv-05555-NGG-RML<br><br><br><br>First Amended Complaint |

Plaintiffs KBH SPORTS CLUB LLC. and DAVID CHUNG ("Plaintiffs" or the "insured" herein), individually and on behalf of all similarly situated gyms, health clubs, health & fitness centers and other businesses bring this Class Action Complaint against AMERICAN ZURICH INSURANCE COMPANY., ("Zurich," the "insurer" or "Defendant"), and on the basis of personal knowledge, information and belief, and investigation of counsels, allege as follows:

## NATURE OF THE ACTION

1.      This is a class action on behalf of Plaintiffs seeking remedy for wrongful denial of

insurance claims submitted to Defendant insurance company and an unfair taking of an unearned insurance premium.

2.       Plaintiffs purchased an all-risk commercial insurance policy from Defendant to protect from unexpected events. Exhibit A ("Policy"). Plaintiffs made claims for coverage under the insurance policy expecting Defendant to indemnify and compensate for the recent losses incurred.[1]

3.       In a swift reaction, Defendant denied and refused to indemnify Plaintiffs for the losses.

4.       The claim denial took less time than a "knee jerk" reaction since the denial letters were, probably, a standard form which were pre-written even prior to submission of the claims.

5.       Defendant summarily, uniformly and consistently, rejected all claims across-the-board on substantively same or similar insurance policies held by Plaintiffs and the proposed members of the class, ("Blanket Rejection" hereon).

6.       These Blanket Rejections were unjustified, unreasonable and without proper basis.

7.       Plaintiff further seeks remedy for Defendant's unfair business practice of unjustly profiting and retaining excessive premiums.

8.       Recent developments, including business suspensions and business interruptions, have substantially reduced the risks associated with the commercial insurance. Yet, Defendant overcharged, continues to overcharge and collect excessive premiums.

9.       The current premium does not reflect the changed circumstances. Nor does the current premium take into account the existing business climate.

10.      No risk was attached to the parts of the Policy. Only partial risk was attached to

---

[1] Plaintiffs' insurance policy became effective January 5, 2020 and renewed on January 5, 2021.

other parts of the Policy.    Plaintiffs are entitled to a partial refund of the insurance premium paid.

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").   The aggregate claims of all members of the proposed class and subclasses are in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative class members.   Plaintiffs, as well as members of the proposed class, are citizens of a state different from Defendant.

12.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omission, and acts giving rise to the claim occurred in this District where Defendant distributed, marketed, advertised, and sold the insurance policy at issue throughout New York and New Jersey.

13.    Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue because Plaintiffs and a substantial portion of putative class members are residents of this District and a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

14.    This Court has personal jurisdiction over Defendant because it is authorized to do business and does business in New York and New Jersey, has marketed, advertised and made sales in New York and New Jersey, and has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

## FACTUAL ALLEGATIONS

### COVID-19 Disease and the Global Pandemic

15.    Coronavirus disease 2019 (COVID-19) is a contagious respiratory and vascular

3

disease caused by severe acute respiratory syndrome coronavirus2 (SARS-2-CoV-2).

16.     COVID-19 virus mainly spreads from symptomatic and asymptomatic people through the air, primarily by small droplets or aerosols, as an infected person breathes, coughs, sneezes or speaks. An infected person remains infectious for 10 – 14 days.

17.     The World Health Organization (the "WHO") declared COVID-19 a Public Health Emergency of International Concern (PHEIC).   On March 11, 2020, the WHO declared COVID-19 a pandemic.

18.     As of February 2021, more than 28.2 million Americans were infected and more than half-million lives perished due to COVID-19 pandemic.

19.     In order to prevent the spread of COVID-19 disease, authorities worldwide have responded by implementing travel restrictions, lockdowns and business closures. The response has caused global social and economic disruption never seen before in most people's lifetime.

**New York & New Jersey Business Closure Orders**

20.     Concerned with the rising spread of COVID-19 disease, New York and New Jersey governors executed Executive Orders.

21.     In New York, Governor Cuomo signed Executive Order No. 202.3 (the Business Closure Order" hereon) on March 7, 2020, directing closure of certain retail businesses.   The closure included a separate directive for "gym, fitness centers, classes and movies theatres to cease operation on March 16, 2020 until further notice."

22.     A few days later, Governor Cuomo signed the "New York State on PAUSE" Executive Order No. 202.6 with a new directive for all "non-essential" business to close statewide.

23.     New Jersey soon followed suit with Governor Murphy signing Executive No. 107 on March 21, 2020, directing the temporary closure of all "non-essential" retail businesses.

24.     The Business Closure Order was lifted in New Jersey on August 27,2020 after Governor Murphy signed an Executive Order No. 181.   The order permitted re-opening of gym, health clubs and fitness centers on September 1, 2020.   However, the businesses were to open at only 25% of full capacity.

25.     The Business Closure Order was lifted in New York City on August 31, 2020 when Mayor de Blasio signed an Emergency Executive Order No 144.   The directive permitted the re-opening of gyms, health clubs and fitness centers on September 2, 2020 at 33 % of maximum capacity.

26.     Both states mandated stringent safety guidelines for businesses to re-open including social distancing and mask or face covering requirements.

**Zurich Insurance Policy**

27.     Plaintiffs and the proposed class members obtained an "all risk" commercial insurance policy ("Policy" hereon), including but not limited to, a Building and Personal Property Coverage Form (CP 00 10 10 12) and Business Income (And Extra Expense) Coverage Form (CP 00 30 10 12), ("BIF"). Policy at *106.

28.     The forms and endorsements in the policy are materially and substantially the same as the policies issued to the members of the proposed class.

29.     The "all risk" policy is a type of insurance coverage which covers all risks or loss except for risks that are specifically excluded.   For instance, if the policy excludes earthquakes and military actions, all other perils are covered.

30.     The "all risk" coverage contrast from a "named peril policy."   In a "named peril policy," the coverage is limited to losses that are specifically listed.   For example, if the policy includes risks associated with earthquakes and the military actions, only those two risks will be

covered.

31.      Under BIF, Defendant agreed to indemnify and compensate for the "loss or damage caused by or result from a Covered Causes of Loss," (the "Covered Loss" hereon).   The Covered Causes of Loss is enumerated in "Causes of Loss – Special Form," (CP 10 30 09 17), ("CLF" hereon).

32.      The CLF, in pertinent part, provides as follows:

> **A.  Covered Causes of Loss**
>
> When Special is shown in the Declarations, Covered
>
> Causes of Loss mean direct physical loss unless the loss
>
> is excluded or limited in this policy. Policy at *115.

33.      The Policy further provides additional coverages for an interruption to business caused by "civil authority," BIF A.5. Policy at *107.   This section states that the insurer "will pay for the actual loss of Business Income sustained and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises."

34.      The BIF provides coverage for different type of losses, including but not limited to, the following; a. Net income that would have been earned or incurred; b. Continuing normal operating expenses incurred, including payroll; and c. Business income other than "Rental Value."

35.      These losses are to be paid to Plaintiffs that occur due to the "suspension" of the normal operations and during the period of restoration.   The BIF also covers "extra expenses" incurred during the "period of restoration."   The "extra expenses" are the "necessary expenses that would not have been incurred if there had been no direct physical loss or damage to the property."

36.      The Policy did not directly exclude or limit coverage for losses resulting from "Business Closure Order."

37.     Furthermore, the insurer did not exclude or limit coverage from pandemic, epidemic or communicable disease or anything alike.[2]

**Wrongful Denial of Plaintiffs' Insurance Claim**

38.     In compliance with the Business Closure Order, Plaintiffs temporarily suspended business operation on or about March 16, 2020.

39.     Plaintiffs submitted a claim to Defendant insurance company following the Business Closure Order requesting coverage for the Covered Loss pursuant to the Policy.

40.     Defendant denied coverage for the Covered Loss, asserting the following (Exhibit B).

    a.  Plaintiffs had not "sustained a physical loss or damage to the property"

    b.  the civil authority provision does not apply to claims.

    c.  Exclusion of loss due to virus or bacteria

    d.  Exclusion based on Acts or decisions, including the failure to act or decide, of any person, group, organization or government body.

    e.  Loss of Market or Delay Exclusion.   "Delay, loss of use or loss of market is not covered."

**Plaintiffs Suffered "Direct Physical Loss or Damage to Property"**

41.     The denial based on lack of "physical loss or damage to the property" is mistaken. Defendant seems to be using "direct physical loss" and "physical loss or damage to property" interchangeably.   Those two terms appear in the same paragraph in the claim denial letter without explanation.

42.     The Policy fails to provide the definition of "direct physical loss" or "damage to

---

[2] "Fitness and Wellness Professional Liability Endorsement" at A.2.s. excludes communicable disease.   The exclusion only applies to this endorsement.

property."    The Policy also does not define "direct," "physical," "loss," "damage" or "property."

43.    The Defendant's glossary of definitions in CLF fails to provide any guidance (CLF G. Definitions).   Defendant also fails to provide the definition of the term in the BIF (BIF F. Definitions) or the BP (BP H. Definitions).

44.    Therefore, the terms must be deciphered using a standard English dictionary or by performing contextual analysis of the Policy applying plain and ordinary meaning of the words.

45.    A cursory application of the Black's Law Dictionary or the Merriam-Webster dictionary permits formulation that equates "direct physical loss or damage to property" to deprivation of the right to use the premises.

46.    The application of the dictionary definition permits the construction that "direct physical loss" is equivalent to deprivation of (loss of) material that has an objective existence (physical) in the natural course of events (direct).    Consequently, direct loss of use of the premises caused by the communicable disease, pandemic and the resulting business closure order constitutes "direct physical loss."

47.    Similarly, application of either dictionaries allows the construction that the "damage to property" can be interpreted to be "the loss of ownership or the right to use the property" for the intended purpose.    Plaintiffs lost the right to use the fitness center as a result of the business closure order.    Plaintiffs were not permitted to operate the business until the business closure orders were lifted.

48.    The contextual analysis of the Policy employing the plain and ordinary meaning to the terms yields the same result.

49.    Commercial General Liability Coverage Form (CG 00 01 04 13, Section V. Definitions. 17. B. "Property damage" means), provides some guidance. Policy at *46.    "Property

damage" can be defined as "*loss of use* of tangible property that is not physically injured." "Property damage" appears to have the same meaning as "damage to property."

50.    In that clause, the term "property damage" includes the inability to "use" the property.   The loss of use of the premises, building and equipment is synonymous with "loss of use of tangible property."   The word "direct" is not a qualifying word for "damage to property."

51.    The term "loss" can also be deciphered by using the Policy language.   The term "loss" can be interpreted by analyzing the Building and Personal Property Coverage Form Additional Limitation – Interruption of Computer Operations. Policy at *90.   In the form, Defendant limits "interruption of computer operations" in part A.4.a. Policy at *107.

52.    That section states that "Coverage for Business income does not apply when suspension or operation is caused by...corruption of electronic data, or any *loss or damage* to electronic data...."   The electronic data is capable of suffering loss or loss of use.   However, electronic data cannot be physically damaged since it is an intangible item.   In that sense, damage can have the same meaning as loss of use.

53.    Due to the fortuitous events and the Business Closure Order, Plaintiffs lost the "use" of the insured property, a Covered Loss.

54.    In regards to "direct physical loss," the communicable disease and the pandemic resulting in the business closure order directly affected physical use and the functionality of the insured property.   The loss of use of the premises is a physical loss as opposed to items like computer data, customer list, accounting, which is not a physical loss.

55.    As a matter of fact, the Policy even covers indirect physical loss.   The BIF A.5.a. covers indirect loss due to "action by civil authority." The Policy under "civil authority," in pertinent part, states that "when a Covered Cause of Loss causes damage to property other than

property at the described premises, we will pay..." Policy at *107.

56.     The "damage to property other than property at the described premises," depicts the loss to other property that causes *indirect loss* or damage to the insured's property.   The loss is indirect because the loss first occurs at the property that belongs to "other than the insured."    If indirect loss of use is covered under the Policy, the direct loss of use must be covered.

57.     Plaintiffs have suffered a direct physical loss and damage to their property because they have been unable to use the property for the intended commercial purpose.

58.      The pandemic and the resulting Business Closure Order prevented Plaintiffs from the use of the premises which is equivalent to "physical loss" or "damage to property."    The functionality of the premises became non-existent.

59.     The New York City government supports the proposition that a pandemic causes a loss and/or damage to property.   The Emergency Executive Order No. 100 dated March 16, 2020 contains the following:

> "WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage." [3]

60.     The "propensity of the virus to spread person to person" refers to the pandemic. The executive order further recognizes that the pandemic is a physical occurrence that causes "property loss and damage."

61.     Although satisfaction of one of the two terms is necessary for coverage, Plaintiffs qualify for compensation based on both "direct physical loss" and "damaged to property."

62.     Lastly, the contradictions and ambiguity in the insurance policies are interpreted against the insurers.

---

[3] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf

**Plaintiffs' Losses Are Covered By Civil Authority Clause**

63.     The denial based on "civil authority" is also erroneous.    The "Civil Authority" is

an additional coverage.    See text below. Policy at *107.

> When a Covered Cause of Loss causes
> damage to property other than property at
> the described premises, we will pay for the
> actual loss of Business Income you sustain
> and necessary Extra Expense caused by
> action of civil authority that prohibits access
> to the described premises, provided that
> both of the following apply:
>
> **(1)** Access to the area immediately
> surrounding the damaged property is
> prohibited by civil authority as a result of
> the damage, and the described
> premises are within that area but are not
> more than one mile from the damaged
> property; and
>
> **(2)** The action of civil authority is taken in
> response to dangerous physical
> conditions resulting from the damage or
> continuation of the Covered Cause of
> Loss that caused the damage, or the
> action is taken to enable a civil authority
> to have unimpeded access to the
> damaged property.

64.     The civil authorities issued the business closure orders to prevent the spread of

communicable disease and the pandemic.    Access to Plaintiffs' property has been limited,

restricted and prohibited by Business Closure Order and the pandemic.    No one was allowed to

enter the property, including the customers and employees during the crisis.    As such, the

business closure orders prohibited access to Plaintiffs' premises.

65.      All other businesses surrounding Plaintiffs' business were required to comply with

the Business Closure Order.    Consequently, many businesses within one mile of Plaintiffs

suffered the same property damage.[4]

66.     The civil authority clause does not require a physical obstruction to impede access

---

[4] Under civil authority clause, Defendant utilizes "**damage to property**" and "**property damage**" interchangeably.
As mentioned earlier, "property damage" includes "loss of use of tangible property." See Policy at *46.   The tangible
property here is the premises and/or the business.

to the premises.    However, the Ingress/Egress Coverage requires a physical obstruction to afford

coverage. Policy at *152. See text below.

**Ingress/Egress Coverage**

(1) We will pay for the actual loss of Business Income you sustain resulting from the necessary interruption of your business activities occurring at the described premises in the Declarations, when ingress or egress by your suppliers, customers or "employees" to the premises is prevented by physical obstruction due to direct physical damage to a roadway, bridge or physical structure needed to reach such premises.  Coverage shall apply only if the site of the obstruction or damage is within 1 mile of your premises, and obstruction or damage is caused by a Covered Cause of Loss other than flood or earthquake.  This coverage shall apply from the date of the obstruction or damage until the roadway, bridge or other structure is open for normal use, but not for more than 30 consecutive days.

67.    If Defendant wanted to apply the "physical obstruction" language in civil authority

clause, they should have clearly and unambiguously written it into the Policy.    And if

Ingress/Egress clause is intended to supplement the civil authority clause, it should have been

clearly and conspicuously stated.

68.    The "Ingress/Egress" portion of the Policy is an additional coverage that cannot be

utilized to limit or exclude the Covered Loss.

**Exclusions Do Not Apply to Plaintiffs' Claim**

69.    The claim denial based on "virus exclusion" is erroneously applied.    Plaintiffs'

losses were not caused by a "virus" or any requirement to remove the virus contamination from

the insured premises.    No COVID-19 virus was found in, on or around the Plaintiffs' properties.

70.    The actual cause of Plaintiffs' Covered Loss was the communicable disease,

COVID-19 pandemic and the resulting Business Closure.    The intent of the Business Closure

Order was to contain the spread of the pandemic.

71.    Furthermore, the Policy did not exclude coverage for communicable disease.

Curiously, the Fitness and Wellness Professional Liability Endorsement ("FWE") excludes

coverage for "communicable disease." A.2.s. Policy at *79.

72.    The exclusion of the communicable disease only in FWE evinces Defendant's

12

intent to extend coverage for communicable disease in other parts of the Policy. The communicable disease exclusion in FWE would be superfluous if the policy did not afford coverage for communicable disease in other parts of the Policy.

73.     The intent to cover communicable disease is further evidenced by the inclusion of the same in the renewal Policy commencing on January 5, 2021. Exhibit C at *3.   The insertion of communicable disease exclusion in the new extension policy evinces Defendant's intent to cover the same in the old Policy.    At the minimum, Defendant is acknowledging ambiguity in the pre-existing Policy.

74.     Next, Defendant denied the claims based in exclusion from "Acts or decisions, including the failure to act or decide, of any person, group, organization or government body. Policy at *118.   Defendant also denied the claims based on "Loss of Market or Delay Exclusion. Delay, loss of use or loss of market" is not covered. Policy at *117.

75.     The exclusions are catchall phrases that would vitiate any and all legitimate coverages.   For instance, if a dangerous situation causes a loss and the fire department closes the business, Defendant can use the "decision of any person or group" to negate coverage.   Likewise, if the fire department closes the business for prolonged period for safety reasons, Defendant can use "loss of use and loss of market" to refuse coverage.

76.     Moreover, neither of the exclusions are written in proper context.   No one would expect the loss of use exclusion to be inconspicuously hidden away with clauses relating to appliances, smoke, vapor or gas.   Similarly, the "individual, group, and government body" exclusion is hidden away in clauses relating to weather conditions, zoning and defects.

77.     Plaintiffs suffered loss of business income that Plaintiffs reasonably would have expected, but for, the interruption required by the Business Closure Orders.

78.     The "all risk" policy," with "Loss of Income & Extra Expense Coverage" provided by Defendant applies to suspension, restoration, and interruption of operations.   The action by civil authority separately applies as additional coverage.

79.     Plaintiffs are entitled to indemnification and compensation for all losses under the Policy.

**Rejection of Refund for Unearned Premium and Rejection of Discount on Future Premium**

80.     After rejection of the claim, Plaintiffs contacted the insurance broker to salvage refund of the insurance premium for the business suspension period and partial operation period. Plaintiffs also requested discounts on future premiums during the business interruption period.

81.     In another "knee jerk reaction," Plaintiffs' request for refund/reduction in premium was rebuffed by the broker.   Reason for the refusal was because the broker categorized Plaintiffs' business as "dark property" or "vacant property" which fetch higher premium than businesses that are in operation.

82.     The broker is apparently misinformed. Plaintiffs' business is not "dark" or "vacant."

83.     A "dark property" or "vacant property" is a building where a landlord is unable to find a tenant.   Plaintiffs' business is experiencing a period of temporary suspension, justifying lower premium payments.

84.     Plaintiffs' request for refund/discount on premium is not unreasonable under the changed circumstances.

85.     Plaintiffs temporarily suspended operation on or about March 16, 2020.   Plaintiffs were able to re-open the business on or about September 1, 2020 after the Business Closure Order was partially lifted.   Plaintiffs business was restored to 25% of maximum capacity pursuant to

the permitted re-opening guideline.    As of February 7, 2021, Plaintiffs are permitted to operate at 35% of the full capacity.

86.    In the interim, the insurer's exposure to risk of loss was substantially reduced during the Business Closure Order.    Defendant's exposure to liabilities, such as slip and fall, employee misconduct and professional liability were substantially decreased.

87.    Plaintiffs paid full premium for the aforementioned business suspension and partial restoration period.    Plaintiff continues to make the same pre-pandemic premium payment during the re-opening period.

88.    The New Jersey Department of Banking and Insurance ("DOBI") recognized the urgency of addressing the retention of unearned premiums by the insurance companies.    On May 12, 2020, the DOBI issued Bulletin 20-22. See texts below.

On May 12, 2020, the New Jersey Department of Banking and Insurance ("DOBI") issued **Bulletin 20-22** ordering insurers to make an initial premium refund or other adjustment to all New Jersey policyholders adversely impacted due to overstatement or misclassification of  risk resulting from the COVID-19 pandemic. Insurers are directed to provide each affected policyholder with a notification or the amount of the refund or adjustments by **June 15, 2020**. Insurers who can demonstrate that its rates are not excessive, inadequate, or unfairly discriminatory, or otherwise contends it should not be subject to the terms of this Bulletin, are to provide information to the DOBI by **June 1, 2020**.

89.    The DOBI Bulletin requires an initial premium refund or other adjustments to be made to all adversely affected by the COVID-19 pandemic, with certain exceptions.

90.    Plaintiffs have yet to hear from the Defendant regarding the initial premium refund ordered by DOBI.    In fact, Defendant raised the insurance by more than $ 6,000 in the January 2021 renewal.    The increase is more than 30% of the original premium.[5]    Because the business is operating at lower capacity, the new premium has the same effect as tripling or quadrupling the

---

[5] Plaintiffs attempted to negotiate insurance policy with other insurance companies. No insurance company will insure Plaintiffs during the pendency of this lawsuit.  The insurance industry appears to have a "blacklist" for small businesses they deem to be trouble makers.

insurance expense.

91.     The obligation to reduce premium is consistent with development in the insurance industry shortly after the pandemic outbreak.   AllState, Geico and other insurance companies have taken upon themselves to reduce the insurance rates.[6]   The reasoning behind the discount is the reduction in exposure to liabilities.   Since automobile owners are driving less due to the "Stay at Home Order," the accident rate has been declining thereby justifying the reduction in premium.

92.     Pursuant to N.Y. Ins. Law § 3428(a)(McKinney 2000), the unearned premium should be returned to the Plaintiffs.[7]   The state of New Jersey has similar regulation on the issue of unearned premium.

93.     The circumstances were neither foreseeable nor contemplated by the parties.   The premium was set prior to the pandemic and without the knowledge of effect on the businesses.

94.     Defendant continues to charge and retain the premium based on the pre-pandemic business operations and associated risks.   The risk to Defendant has not run on portions of the Policy.[8]   The risk of loss is minimal in other portions of the Policy.

95.     The premium for the suspended business operation period must be prorated and adjusted accordingly.   The premium for the business restoration period must be calculated and adjusted.

96.     The unearned premium results in a "windfall" for the Defendant and an unfair

---

[6] https://www.natlawreview.com/article/due-to-covid-19-your-car-insurance-company-refunding-you-money

[7] N.Y. Ins. Law § 3428(a)(McKinney 2000) states "whenever an insurance contract made or issued in this state is cancelled or otherwise terminated by the insured before expiration...the earned premium to be retained by the insurer shall be determined by the applicable rate filing."   Although this section relates to policy cancellation, the key concept is that the "unearned premium" must be returned to the policyholder.   Furthermore, the premium is not fully earned at the inception of the policy.   The regulation states, "commercial insurance policy that is fully earned at policy inception" is deemed to "have excessive rates in contravention of Article 23 of the Insurance Law."

[8] The Policy is separated into different "forms and endorsements."   The forms and endorsements include commercial general liability, commercial property and general liability.   The subsections of the forms and endorsements provide coverage for employment related practices, commercial automobile, abusive acts, property enhancement, equipment breakdown protection, crisis event, among others.   All sections of the Policy can be apportioned and prorated.

premium payment for Plaintiffs.

## **PARTIES**

97.     Plaintiff KBH Sports Club LLC. is a New Jersey limited liability company with its principal place of business located at Voorhees, New Jersey, Camden County.

98.     KBH Sports Club LLC. is wholly owned by Plaintiff David Chung.   Plaintiff Chung is a citizen of the State of New York and resides in Staten Island New York, Richmond County.

99.     Plaintiff Chung is a third-party beneficiary to the Insurance Policies.     Plaintiff Chung is a third-party beneficiary under Commercial General Liability Coverage Form, Section II. Who Is An Insured, 1. c. Policy at *40.   The section IV 2 and 3 lists duties and obligations on the insured in order to make a claim or file a suit. Policy at *42.

100.     Plaintiff Chung is also a third-party beneficiary under Building and Personal Property Coverage A. Coverage 5.b.(1) Personal Effects And Property of Others. Policy at *97. Additionally, Plaintiff Chung is a third-party beneficiary under parts of Venture Programs – Property Enhancement Endorsement.

101.     This section covers a variety of losses such as those resulting from theft, property damage, criminal acts and other losses that are not enumerated in other parts of the Policies at *130.

102.     The pandemic and the resulting Business Closure Order had a profound negative impact on Plaintiffs' once thriving business.

103.     The Business Closure Order halted all of Plaintiff's business activities.

104.     Unlike similar businesses that continued to charge membership fees after the Business Closure Order, Plaintiff ceased all billing of the membership fees.

105.     Most painful for Plaintiffs was the fact that they had to lay-off all employees who relied on Plaintiffs for their income.

106.     Plaintiffs business continues to be affected with the limited restoration/partial re-opening.

107.     Defendant American Zurich Insurance Company is a corporation organized under the laws of Illinois with corporate address of 1299 Zurich Way, Schaumburg, IL 60196.

## CLASS ACTION ALLEGATIONS

108.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3) ("the Class").

109.     The proposed Class consists of: All gyms, health clubs, health & fitness centers and other similarly situated businesses in the United States and its territories or possessions whose claims were denied by Defendant as set forth in the Complaint; and All gyms, health clubs, health & fitness centers and other similarly situated businesses in the United States and its territories or possession who over-paid insurance premium to Defendant as more fully set forth herein.

110.     Plaintiffs also brings this suit on behalf of sub-classes consisting of insured whose claims were denied by Defendant in New York and New Jersey during the proposed class period and/or over-paid the insurance premium.

111.     The members of the Class are so numerous that joinder is impracticable.

112.     Plaintiffs' claims are typical of the claims of the entire Class.

113.     Plaintiffs will fairly and adequately represent and protect the interests of the other class members for purposes of Federal Rule of Civil Procedure 23(a)(4).

114.     Plaintiffs have no interest antagonistic to those of other Class members.

115.     Plaintiffs are committed to the vigorous prosecution of this action and has retained

counsel experienced in class action litigation.

116.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

a.   Whether the "all risk" policy cover losses resulting from the COVID-19 pandemic;

b.   Whether the Policy cover losses resulting from non-essential Business Closure Orders;

c.   Whether the Policy cover losses from action by civil authority denying access to the premises;

d.   Whether Defendant wrongfully denied coverage on the submitted claims;

e.   Whether Defendant breached its policy by denying coverage on the COVID-19 pandemic related losses;

f.   Whether Plaintiffs and members of the Class sustained injuries or damages as a result of Defendant's denial of submitted claims;

g.   Whether Plaintiffs are entitled to refund of premium during the business suspension and the business interruption period.

h.   Whether Defendant's conduct constitutes unjust enrichment, and whether equity calls for disgorgement of unjustly obtained funds, restitution to, or other remedies for the benefit of the Class;

i.   Whether Plaintiffs and members of the Class are entitled to equitable relief; and

j.   Whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or the multiplier to the actual or potential harm to the Class.

117.     Class certification under Federal Rule of Civil Procedure 23(b)(3) is superior to other available methods for the fair and efficient adjudication of this controversy.

118.     Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.

119.     Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

120.     Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

<u>**CAUSES OF ACTION**</u>
<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT**</u>

121.     Plaintiffs incorporate by reference all preceding paragraphs.

122.     Plaintiffs and the class purchased the Policy from Defendant.

123.     The Policy is valid and enforceable contract.    The Policy is in full force and effect.

124.     On or about March 2020, Plaintiffs submitted its claims to Defendant.    Defendant has denied the coverage without factual or legal basis.

125.     Defendant is in breach of an enforceable contract by refusing to provide coverage under the Policy.

126.     No valid exclusions or limitations exist to deny coverage to Plaintiffs' claim.

127.     Defendant is obligated to insure, indemnify and compensate Plaintiffs for losses arising out from the Policy.    Plaintiffs have sustained losses covered by the Policy.

128.     Defendant breached its contractual obligation and unjustly refused to pay claim for losses incurred.

129.     Defendant is legally bound by the contract to pay all damages caused by the breach of contract.

130.     As a direct and proximate cause of Defendant's breach, Plaintiffs and the Class have sustained damages.

**COUNT II**

**UNJUST ENRICHMENT**

**Refund of Unearned Premiums**

131.     Plaintiffs incorporate by reference all preceding paragraphs.

132.     Plaintiffs and the Class conferred a benefit on Defendant in the form of monies paid for a full insurance coverage.

133.     Defendant has knowledge of these benefits.    Defendant accepted and retained the benefits of the full insurance premium payments.

134.     As a result of the Business Closure Order, the business operations of Plaintiffs and the Class have substantially decreased or non-existent, substantially reducing Defendant's exposure to risk.

135.     Defendant has continued to charge and collect excessively unfair premiums. Defendant has failed and refused to voluntarily return the same.

136.     Because Defendant did not provide the full pre-pandemic insurance coverage, it would inequitable for the Defendant to retain them without refunding the value thereof.

137.     Defendant has been unjustly enriched, warranting disgorgement of excessive premiums paid for which Plaintiffs and the Class did not receive benefit.

**COUNT III**

**MONEY HAD AND RECEIVED**

**Refund of Unearned Premiums**

138.     Plaintiffs incorporate by reference all preceding paragraphs.

139.     Defendant received money in the form of insurance premium intended to fully cover and indemnify Plaintiff for covered losses.

140.     The paid premium was not used for the full benefit of Plaintiffs and the Class. Defendant has not refunded the wrongfully obtained money to Plaintiffs and the Class.

141.     Defendant continues to charge full premium while providing only part of the pre-pandemic risk coverage.

142.      Plaintiffs demand partial return of the unearned premium paid and restore Plaintiffs to their original position.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all members of the Class, pray for judgment as follows:

A.      Certifying the proposed Class as requested herein;

B.      Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.      Declaring that Defendant has committed the violations of law alleged herein;

D.      Providing for any and all injunctive relief the Court deems appropriate;

E.      Awarding statutory damages in the maximum amount for which the law provides;

F.      Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.      Providing for any and all equitable monetary relief the Court deems appropriate;

H.      Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I.       Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

J.       Awarding pre- and post-judgment interest to the extent the law allows; and

K.       For such further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:    March 1, 2021

*/s/ James Chung*
LAW OFFICE OF JAMES CHUNG
James Chung
43-22 216th Street
Bayside, NY 11361
Telephone: (718) 461-8808
Facsimile: (929) 381-1019
*jchung_77@msn.com*

SHEEHAN & ASSOCIATES, P.C.
Spencer Sheehan
60 Cutter Mill Road, Suite 409
Great Neck, NY 11021
Telephone: (516) 260-7080
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

*Attorneys for Plaintiffs*